# UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF MICHIGAN

A-MAC SALES & BUILDERS CO., INC.,
a Michigan Corporation,

        Plaintiff,

VILLAGES AT PARKSIDE, LLCs I-IV, Michigan
limited liability companies, THE DETROIT HOUSING
COMMISSION, a Michigan corporation,
DHC PARKSIDE, INC., a Michigan corporation,
CAPITAL NEEDS UNLIMITED, a Massachusetts
corporation, KEN MOODY, IRENE HANNAH,
JOHN NELSON and DOES 1-20

        Defendants.

_____/

Mark L. McAlpine (P35583)
Steven A. Wright (P56970)
McALPINE & McALPINE, P.C.
200 East Long Lake Road, Suite 160
Bloomfield Hills, MI 48304
(248) 723-5100
Attorneys for Plaintiff A-MAC Sales &
Builders Co., Inc.

_____/

# 00-74899

CASE NO.
HONORABLE

AVERN COHN

MAGISTRATE JUDGE MORGAN



## COMPLAINT and JURY DEMAND

Plaintiff, A-MAC Sales & Builders Co., Inc. ("A-MAC"), by its attorneys McAlpine &

McAlpine, P.C., states its Complaint against the Villages at Parkside, LLC I - IV, the Detroit

Housing Commission, DHC Parkside, Inc., Capital Needs Unlimited, Ken Moody, Irene Hannah,

John Nelson and DOES 1 – 20 as follows:

## NATURE OF ACTION

1.      This lawsuit arises out of the work of A-MAC Sales & Builders Co. ("A-MAC")

on various public housing projects for the Detroit Housing Commission ("DHC").  The

Defendants played various roles in the projects and acted in concert to defraud A-MAC, defame

its business reputation and use it as a "scapegoat" in order to conceal the Defendants'

mismanagement of the various projects and their mismanagement of federal funds received from

the Department of Housing and Urban Development ("HUD").  This action states claims for

violations of the Racketeer Influenced and Corrupt Organization Act ('RICO"), the Sherman

Anti-Trust Act, and alternative and cumulative claims against the various Defendants in tort,

contract and equity founded on statutory and common law entitlements.

## JURISDICTION AND VENUE

2.      Jurisdiction and venue of this action are proper in this Court.  This Court has

original jurisdiction over the RICO and Sherman Anti-trust claims pursuant to 28 U.S.C. §1331.

This Court has exclusive jurisdiction over Count II pursuant to Section 4 of the Clayton Act and

29 U.S.C. §1337.  This Court has pendent jurisdiction over the remaining claims.  Venue is

proper in this District under the provisions of 28 U.S.C. §1391(b) since most of the events giving

rise to the claims occurred in the City of Detroit.

## PARTIES

3.      Plaintiff A-MAC Sales & Builders Co., Inc. ("A-MAC") is a Michigan

corporation with a business address of 1528 Woodward Detroit, Wayne County, MI  48226.

4.      Defendant City of Detroit Housing Commission ("DHC"), with its offices located

at 2211 Orleans, Detroit, Michigan 48207, is, upon information and belief, the City of Detroit

entity which procures federal funds from the Department of Housing and Urban Development

2

for use in public housing. The DHC was the Owner of the Village of Parkside property (the "Property") at issue in this action. On information and belief, in order to procure tax credits, the DHC ultimately transferred the property to related entities.

5.      Defendant the Villages at Parkside, LLC, I, II, III and IV ("Parkside I, Parkside II, Parkside III or Parkside IV" respectively, "Ownership Entities" collectively) are, upon information and belief, Michigan limited liability corporations set up by the DHC to develop the Property. These entities were created by the DHC so that the DHC could receive state tax credits for the public housing work that was being done. On information and belief, the DHC transferred the Village of Parkside property to the Ownership Entities.

6.      Defendant DHC Parkside, Inc., with its offices at 1301 E. Jefferson, Detroit, Michigan 48207, is, upon information and belief, a company set up by the DHC as the development managing member of the "Ownership entities". It is also the Ownership Entities' designee with respect to the Property. The DHC mandates that the Executive Director of the DHC is the President of DHC Parkside, Inc. and the Assistant Executive Director of the DHC is the Vice-President of DHC Parkside, Inc.

7.      On information and belief, Defendant Capital Needs Unlimited, Inc. ("CNU") is a corporation organized under the laws of Massachusetts, whose address is 57 Westborne Terrace, Brookline, Massachusetts, 02146, with local offices at 555 Brush Street, Suite 1017, Detroit, Michigan 48226. CNU was retained by the DHC and/or the Ownership Entities as the Owner's representative and agent on the Project. CNU appointed Tom Nutt-Powell ("Nutt-Powell") as its on-site project manager and agent. Nutt-Powell lived in Boston and was on the project for its duration for about one or two days each week.

3

8.      On information and belief, CNU retained Defendant Ken Moody ("Moody") of Nathan Johnson and Associates, Inc. as the Owner's architect and agent.

9.      At the times relevant to this action, Defendant Irene Hannah ("Hannah") was the Assistant Executive Director or Executive Director of the DHC and either the Vice-President or President of DHC Parkside, Inc.

10.      Defendant John Nelson ("Nelson") is the current executive director of the DHC. Nelson has been involved and coordinated much of the DHC's improper conduct against A-MAC.

11.      DOES 1-20 are additional co-conspirators and RICO Defendants that have not been discovered.  Because the Defendants attempted to conceal their fraudulent conduct, there may be additional co-conspirators that become known throughout discovery in this matter.

**The Detroit Housing Commission's Problems and Inducement of A-MAC's Help**

12.      The DHC has a long history of management problems.  It was on the Department of Housing and Urban Development's ("HUD") troubled list from 1979 to 1997 for failing to do such basic work as keeping up with repairs and collecting rents.  In 1996, it averted a takeover by the federal government.  In the last six years, the DHC has had four different executive directors, Betty Turner, Carl Greene, Hannah and Nelson.

13.      Since 1993, the DHC has received more than $110 million from HUD to demolish, replace and repair housing at three different complexes (Jeffries, Herman Gardens and Parkside) under a federal initiative known as HOPE VI.  However, because of the DHC's mismanagement, little, if anything, had been accomplished prior to 1996.

14.      In 1996, A-MAC had just completed a very successful public housing project for the City of Highland Park where A-MAC ran all aspects of the project.  Carl Greene, the

4

Assistant Executive Director of the DHC at the time, and Betty Turner, the Executive Director were very impressed by A-MAC's work on that project. They asked A-MAC to become involved in the DHC's public housing projects, because they needed an entity that was capable of running an entire construction project as well as giving credibility to the DHC's public housing efforts.

15.     A-MAC agreed and began providing the DHC with information relating to how to structure, finance and run public housing construction projects. The DHC requested that A-MAC provide a bid for the Village of Parkside project. A-MAC did provide a bid for the project because the DHC represented to A-MAC that it had access to sufficient funds to do the Project.

**A-MAC's Bid is Accepted on the Village of Parkside Project**

16.     On November 21, 1996, the DHC solicited firms to provide a best and final offer for the design/build portion of the Parkside project, including 43 units in Village II and 36 units in Village IV. The units in Village II consisted of 43 new townhouses, and the units in Village IV consisted of 36 new townhouses. All of the units in Village II and IV were to be built in full compliance with the requirements of Section 504 of the Rehabilitation Act of 1973, as amended (29 U.S.C. §§ 4151-4157)(the "Solicitation").

17.     The Solicitation set the following schedule:

| | |
|---|---|
| Bid Documents Issue | mid-December |
| Bids Due | mid-January |
| Bids Awarded | early February |
| Notice to Proceed | first week of March |
| Utility and Site Work | Underway by end of March |

18.     On December 2, 1996, A-MAC submitted bids for Village II, $3,741,380.00 and for Village IV, $3,130,020.00 based on the Solicitation.

5

19.     On January 8, 1997, A-MAC was informed by the Villages at Parkside II and IV that "A-MAC has been determined to be the most highly qualified firm [to] provide the design and construction services required for this project."

**The DHC Misrepresented its Ability to Fund and Manage the Project**

20.     From the beginning, the DHC's problems managing projects continued in the Parkside project. In fact, the mismanagement in the Parkside project was immediate and widespread. Contrary to the DHC's representations, it did not have sufficient management in place to run the project. At the beginning of the project, Carl Greene ("Greene"), the Executive Director of the DHC, left the DHC to take a similar position in Philadelphia. On information and belief, Greene was so concerned about the mismanagement of the DHC, especially the Parkside project, that he indicated in his resignation letter that he would return to assist the DHC with the Parkside project because if current DHC management were left in place, the Parkside project would be a disaster.

21.     Although the Solicitation indicated that the contract would be awarded by mid-February, the Contract was not signed until July 1997, five months later.

22.     Besides mismanagement, another reason that the DHC did not immediately execute the contract was because the DHC, on information and belief, did not have sufficient funds to do the Project. The DHC represented to A-MAC, and on information and belief, represented to HUD, that it had sufficient funds to carry out the Parkside project. However, this was not true.

23.     As part of the Parkside project, the DHC transferred ownership of the property that was the subject of the Parkside project to the Village of Parkside, L.L.C.'s I-IV. This was done so that the L.L.C.'s could qualify for state tax credits that the DHC could not otherwise

6

obtain. On information and belief, there was much opposition inside the DHC to transferring

private property to a DHC run L.L.C. However, the property was transferred and the DHC, and

through the Formidable Group, the DHC actively attempted to sell these tax credits to obtain

additional monies for the Parkside project.

24.      Because of the lack of funds and the mismanagement of the Parkside project, the

DHC did not execute the contract with A-MAC until July 10, 1997. At that time, the Village of

Parkside II, L.L.C. and the Village of Parkside IV, L.L.C. (collectively the "Owners") entered

into contracts with A-MAC. At this time, the Project was already over four months behind

schedule.

**The DHC Refused to Timely Provide A-MAC with the Notice to Proceed**

25.      The Parkside project was a design/build project. As such, almost immediately

after the contract was executed, A-MAC and its architect, Hamilton Anderson & Associates

("HAA"), began working on the drawings needed for the project. However, A-MAC could not

begin construction as its bid envisioned because it had not yet received the Notice to Proceed,

which was required before construction could begin.

26.      Although the Solicitation set the date of issuance of the Notice to Proceed with

construction as the first week of February, the Notice to Proceed with construction had still not

been issued in November. As such, in a meeting with DHC personnel in November 1997, A-

MAC, having done so previously, again requested the Notice to Proceed with construction.

27.      Although A-MAC requested the Notice to Proceed with construction, it was not

forthcoming. Until February 24, 1998, when A-MAC received a Notice to Proceed via facsimile.

This facsimile noted "You are notified that the contract term for work on the above contract will

commence July 10, 1997." This, however, was the first Notice to Proceed that A-MAC received

for the project. As the Solicitation set the schedule for the Notice to Proceed for the first week in March 1997, the Notice to Proceed was issued almost one year late.

28.    Despite claims to the contrary, it is clear that the Owners did not provide the Notice to Proceed to A-MAC on July 10, 1997. For example, the Notice of Commencement for the Project was not filed with the Wayne County Register of Deeds until September 29, 1997. The Notice of Commencement, which is to be filed before any construction begins, notes that, "...work is about to commence..." Moreover, Nutt-Powell, in a report to the Board of Directors of DHC Parkside, Inc. admitted that, "The Notice to Proceed did not reach A-MAC until early February 1998."

29.    The site work, which was to be completed before A-MAC started construction, was the sole responsibility of the DHC and not part of A-MAC's contract. This work had not started as of February 1998.

30.    A-MAC arrived on the site to begin construction shortly after receiving the Notice to Proceed on February 24, 1998.

**The DHC Mismanaged its Preliminary Site Responsibilities on the Project**

31.    A-MAC's contract was only for work in certain parts of the Project, Villages II and IV. DHC retained the responsibility for the site work and was to engage other contractors for that work. Specifically, A-MAC's contract did not include items related to the entire site, such as installation of utilities, putting in roads, laying out where specific buildings would be on the site or landscaping. This was confirmed in a pre-contract meeting on January 14, 1997, when the DHC made it clear that A-MAC's contract would include a design/build project for specific units, and did not include such items as site utilities, roads, site amenities and landscaping.

32.     The DHC represented to A-MAC that site utilities, roads and site amenities would be performed under a "separate contract," and would be completed prior to A-MAC's work so as not to interfere with A-MAC's activities. However, although the DHC represented to A-MAC in the Solicitation that site work would be underway by the end of March 1997, the site work did not begin until March 1998, eight months after A-MAC signed the contract in July 1997. On information and belief, the DHC did not begin its required site work because it had insufficient funds to retain a site contractor.

33.     On information and belief, the DHC retained ABC Contractors to do the road improvements, install water, sanitary sewer and storm sewer work, all of which had to be (and was represented would be) accomplished prior to A-MAC's construction activities.

34.     Although the DHC knew that it did not have the money to do site work, and indeed, had not even prepared the Notice of Commencement which was needed before site work could begin, the DHC misrepresented the status of site work to A-MAC. Specifically, during a meeting on July 22, 1997, it was represented to A-MAC that ABC Contractors would do the road improvements in early August. It was noted that ABC would install water, sanitary sewer and storm sewer. At this time, the site work was over four months behind schedule.

35.     Contrary to the DHC's representations, ABC Contractors did not begin its work in mid-March or in August. Indeed, in a meeting on October 21, 1997, Moody admitted that they were still having problems with the roads and utility companies because "[d]elay in payments has held this up."

36.     As of October 1997, ABC Contractors had yet to determine the necessary sewer depths because the Owner failed to provide this information. As such, ABC Contractors had to provide a Change Order Request for exploratory excavations to determine sewer depths. This is

9

an example of the DHC's failure to manage and coordinate the Parkside project. All of this delayed A-MAC's work on the project.

37.     Additionally, ABC Contractors did not receive its permit to do site work until March 1998. However, no work could be started until the locations of sewers were known. Without the locations of the sewers, the sites and locations for the townhomes could not be determined. Therefore, when A-MAC arrived on site in March 1998, the site was not ready for A-MAC to begin its excavation work for the basements, the first work A-MAC was to start.   In fact, A-MAC could not immediately get its trailer on the site due to the poor site conditions. Finally, ABC Contractors began limited site work in March 1998,  one year after it was supposed to start such work.

38.     The DHC also failed to properly layout the locations of the buildings on the site. Prior to any construction, including road and utility construction, the Owner was required to specify the exact location of the various townhomes on the site. However, as of March 1998, one year after the road and utility work was to begin, the DHC Defendants, CNU and Moody all failed to perform any of this work.

39.     Besides mismanagement, the DHC Defendants did not have the site work performed because it did not have the funds to perform such work. The Owner's surveyor did not perform the layout to determine the starting point for the site until April 10, 1998 because it had not been paid monies it was owed for the site survey. Indeed, as of April 20, 1998, there was only one building that was "laid-out" in Village II and no buildings were "laid-out" in Village IV. Accordingly, A-MAC could not begin its excavation work, the first construction work it was to do on the site.

10

40.     The DHC Defendants have admitted that they did not properly manage the site. Additionally, despite their many misrepresentations to A-MAC, finally, in July 1998, the DHC Defendants admitted that they changed the road and utilities construction schedule and that this change harmed A-MAC. For instance, on July 28, 1998, Moody informed the contractors that, "...the installation of the roads and underground utilities were done out of phase; which also increases the hardship on the building contractors."

41.     Shortly after starting excavation of the basement in Village II, a water infiltration problem was encountered. A-MAC diligently dewatered the impacted work several times but was unable to rectify the problem. Over time, it was determined that a nearby City of Detroit storm sewer was causing the water infiltration problem through no fault of A-MAC. This problem delayed A-MAC's work on the Parkside project.

**The Defendants Engaged in a Concerted Scheme to Blame A-MAC for the Project Delays and Obtain Additional Funding from HUD**

42.     On information and belief, HUD was severely critical of the DHC for its failure to make meaningful progress on the Parkside project. The Defendants, in a scheme to deflect responsibility and mislead HUD, engaged in an artifice to use A-MAC as the scapegoat. Additionally, on information and belief, because the DHC still did not have sufficient monies to fund the Parkside project, the Defendants also engaged in a scheme to get additional monies from HUD by issuing change orders for increased costs that it would blame on A-MAC.

A.     **Acceleration of Basements to Correct for Utility Delays Caused by the DHC**

43.     Having delayed the Parkside project for a year and in an effort to conceal their mismanagement and misrepresentations, the Defendants began to accelerate A-MAC's contract within a month of when it arrived on the site. According to the contract, A-MAC was to first excavate the basements for the townhomes. Then, it was to run utilities five feet away from the

11

homes and then the utilities would be connected to those utilities put in place by the utility companies.

44.     Because of the lack of funds and site management problems discussed above, the utility work was not performed prior to A-MAC arriving on site. Indeed, when A-MAC first arrived on site, on information and belief, the utility companies had refused to do any site work. In fact, although A-MAC was on the site by March 1998, the utility companies informed the DHC that they would not arrive on site to do utility work until June 19, 1998.

45.     The DHC was concerned about getting the utility companies to perform the work. But, because HUD was severely critical of the DHC, the DHC could not continue to delay A-MAC's work until the utility work was completed. In fact, at a May 19, 1998 meeting, Moody noted that "Given what else is going on in Detroit, failure to start utilities at this date probably means we'd lose the crews, and not know when they would return."

46.     Because of its previous failures with respect to the schedule, the DHC began to accelerate the work to get all of the basements completed prior to June 19, 1998, the date that the utility companies were to do their work. On information and belief, the DHC knew that it would cost additional monies, monies that it did not have, to get the basements done in time. Specifically, on May 31, 1998, Nutt-Powell informed A-MAC that, "[o]bviously, A-MAC must now engage multiple foundation sub-contractors to achieve the target completion schedule so that the utilities can be at the site on schedule." If the DHC had executed the contract timely, and issued the Notice to Proceed when it represented that it would, and if the DHC would have had the site work performed when represented, this would not have been a problem.

47.     The Defendants, in an attempt to obtain additional funding for the Project, and to hide from HUD the Defendants' sole responsibility for the delays on the Parkside project, began

to frantically attempt to complete the basements on the project. Indeed, the Project Manager, in an attempt to complete the basements pursuant to an accelerated schedule, attempted to have another contractor, Filmore, perform some of A-MAC's work using "pre-fabricated" basements. Filmore brought the pre-fabricated basements onto the site at a critical stage. However, the "pre-fabricated" basements were never approved by the DHC. The DHC, therefore, contacted the police who had Filmore remove the basements from the site. Obviously, the Program Manager and the DHC Defendants had not property coordinated these efforts.

48. The Program Manager's failed attempt to use an alternate foundation system delayed the completion of the project because A-MAC could not work on the site with the prefabricated basements sitting on the site. Again, this illustrated a complete lack of management by the DHC Defendants on this project.

49. Although the DHC Defendants accelerated the schedule and took work away from A-MAC, ultimately the utility companies refused to do the work in June 1998 because they claimed the site was not ready for utilities. Ultimately, it was the Owner's continuing mismanagement that resulted in the utility companies determining that the site was not ready for utilities. The reasons the site was not ready for utility installation, none of which had to do with A-MAC, were (1) ABC grading problems; (2) substantial concrete was in the way; and (3) there was no above ground layouts at critical locations. Thus, a year after the contract was issued, the DHC had still not done the required site work, something even the utility companies noticed and which caused still further delays.

13

**B.      DHC Improperly Terminates/Modifies A-MAC's Contract to Obtain Additional HUD Funds**

50.      On information and belief, HUD continued to severely criticize the DHC for the delays in the project. In addition, on information and belief, DHC knew that it still did not have sufficient funds to do the project, something it was attempting to conceal from HUD.

51.      Thus, notwithstanding the Owner's failure to provide site layouts, roads or the other site improvements it promised, shortly after construction work began, the Owner, through legal counsel, falsely informed A-MAC that its progress was not satisfactory and that "A-MAC's failure to perform in a timely manner has jeopardized timely completion of the work underway at the site, including utilities, roads and the housing units being rehabilitated." However, it was the DHC's responsibility (as stated in the Solicitation) to have the roads and utilities in before A-MAC began construction.

52.      For example, on June 10, 1998, Moody suggested that, "A-MAC's lack of performance could have a twenty to thirty million dollar impact and delay occupancy for two or more months." Clearly, the Owner was attempting to find a "scapegoat" for its complete failure to do anything on the project for the first year in an effort to conceal the Owner's breaches and misrepresentations.

53.      On June 17, 1998, A-MAC was notified that the contract between it and the Owner was being terminated for convenience by the Owner. The effective date of termination was stated to be June 17, 1998 for Village II and June 30, 1998 for Village IV.

54.      The Owner's reasoning for the termination was not stated nor factually known by A-MAC. However, it is clear that the Owner wanted to accelerate the contract to make up for its delay by having more contractors work on the Project. Additionally, on information and belief, the DHC felt that by modifying the contract and moving work to other subcontractors, that it

14

could both get additional funds from HUD and place blame for the delay on A-MAC. All of the Defendants cooperated in this scheme.

55.    One week later, June 25, 1998, a letter was sent to A-MAC, which served as notice that the DHC was reinstating the contract. The letter states "We have determined that it is advantageous and in the best interest of The Villages at Parkside II, L.L.C. and The Villages at Parkside, IV, L.L.C. to reinstate the above referenced contracts. This letter rescinds our Notice of Termination dated June 17, 1998."

56.    As a condition of reinstating A–MAC's contract, the DHC required A-MAC to "subcontract" much of its work to another contractor, DeMaria. A-MAC was specifically required to use DeMaria and could not have the subcontract competitively bid. This unnecessarily inflated the price of the subcontract, which, on information and belief, was what the Defendants attempted to accomplish so that they could acquire additional funds from HUD. As such, while the work that A-MAC was forced to turn over was for $3.1 million, it was required to pay $3.9 million to DeMaria for the same work pursuant to a Change Order. In addition, DeMaria had the ability to be reimbursed for acceleration costs. On information and belief, the DHC requested many of these additional funds from HUD to make up for the lack of funds on the project.

57.    An Addendum to the Contract, dated July 1, 1998, was executed which:

- contractually reinstated A-MAC,

- redefined the relationship between A-MAC and Owner via a letter of understanding dated June 30, 1998 from the Owner to A-MAC;

- changed the baseline schedule;

- delineated a forward going schedule of values;

15

- established a subcontract from A-MAC to DeMaria Building Company, Inc. and;

- included a project organization chart which portrays subcontractors (all trades), including DeMaria, reporting to A-MAC, A-MAC reporting to Owner, and Hamilton Architects reporting to A-MAC and indirectly reporting to Owner.

58.     Within one week, the DHC went from terminating A-MAC's contract to stating that "… it is advantageous and in the best interest of … to reinstate the above-referenced contracts." In the end, the only thing accomplished by terminating and then reinstating A-MAC's contract was the forced assignment of the majority of Village IV's work, but none of the design development risk, to DeMaria.  More importantly, in furtherance of the Defendants' scheme, the Defendants were able to both blame A-MAC for the delays and use the modification to request more money from HUD.

**C.     The DHC's Improper Modification Also Accelerated A-MAC's Schedule**

59.     As part of the reinstatement of A-MAC's contract, the DHC through the same coercion that took work from A-MAC and gave it to Demaria, changed the project end date to November 19, 1998.  Specifically, the Change Order that sole-sourced DeMaria as the subcontractor for the majority of the work remaining on Village IV, also unilaterally set the project end date to be November 19, 1998.

60.     The DHC accelerated the Project because it was attempting to respond to criticisms by HUD.  Moreover, because the DHC failed to have the site properly prepared, on information and belief, the utility companies refused to come back to the site until November 17, 1998, when they requested that all basements be completed.

61.     The supposed intent of the cosmetic date was to give HUD the false impression that the project would be complete within the previously stated time frame.

16

**D.     The DHC's Second Improper Modification of A-MAC's Contract**

62.     The Owner, in an attempt to again accelerate a project that it had delayed, and obtain additional funds from HUD, improperly modified A-MAC's contract for a second time. Specifically, in 1998, the Owner signed a unilateral change order that moved three buildings, 2C, 2G and 6A, over to DeMaria. No authorized employee of A-MAC ever signed such a change order.

63.     The delays in these buildings, however, were not the fault of A-MAC. The delays with building 6A were created by the installation of a power cable in the building's footprint. This was caused by defective surveying and mismanagement by DHC which caused a change in the building size and caused A-MAC to halt construction.

64.     The delay in Building 2C was caused, in part, by sewer problems caused by the DHC. This problem was a pre-existing condition and no fault of A-MAC. Moody, however, improperly utilized DeMaria to remove and replace the foundation without any consultation with A-MAC.

65.     Pursuant to the unilateral change order, the Owner reduced A-MAC's contract by $603,815, although A-MAC's bid for this work was $86,828 for Building 2C, $94,140 for Building 2G and $103,047 for Building 6A. Not only was the Owner's unilateral contract modification improper, but the amount deducted from A-MAC's contract was improper and excessive. Thus, the Defendants were continuing the scheme to use A-MAC as a "scapegoat" while attempting to hide the true cause of the delays from HUD.

**E.     In Furtherance of the Scheme, Defendants Interfered With, Hindered and Disrupted A-MAC's Work**

66.     A-MAC's contract required specific duties of each of the parties to the Contract. A-MAC was required to provide design, construction, permits, and warranties and to complete

17

the Work described in the Contract, in strict accordance with the plans, specifications, the Owner's request for proposal, A-MAC's proposal and the negotiated Best and Final Offer.

67.    The Owner's duties included timely reviewing and marking up the design drawings and issuing change orders for extra work or significant changes to the work and making prompt payment for the work performed.

68.    Both parties also had implied obligations not to interfere with, hinder, or disrupt the performance of the other party, and to act fairly and in good faith.

69.    Through the actions and inaction of the Owner's Project Manager, (Nutt-Powell) and the Owner's architect (Moody) each and every one of these obligations was breached by the Owner.

70.    A-MAC, as the design/builder contractor, should have been allowed to use any design and construction means they chose to meet the minimum functional requirements of the contract in the least costly manner possible.

71.    For this reason, the Owner is ultimately responsible for the resulting increased costs and time extension due to the Program Manager and his staff's actions and inaction which impacted A-MAC's design development and construction means and method.

72.    Both under the Contract and through its implied warranties, the Owner owed A-MAC the duty to refrain from interfering with, hindering or disrupting A-MAC's execution of the work.

73.    Additionally, the Owner was responsible for coordinating all work on the site among the various contractors. This was not done and increased the costs for all contractors.

74.    The following are examples of how the Defendants interfered, hindered, and disrupted A-MAC:

18

A.    The Contract states that two Notices to Proceed ("NTP") would be issued by the Owner or the Owner's Representative. The first initiated the Design work, and the second released the Contractor to begin construction. The Contract is very clear that no work is to proceed until the necessary NTP is issued. A-MAC did proceed with the design work because the design portion of the contract was less than 5% of the total contract value. On or about November 25ʹ 1997, after the design was complete, A-MAC informed the Owner's Project Manager that they still had not received a NTP. Due to the increased financial exposure, A-MAC insisted on the contractually required NTP prior to beginning construction. Finally on February 24, 1998, A-MAC received a faxed copy of the NTP, dated July 10, 1997. The late issuance of the NTP interfered with A-MAC's ability to beginning construction and effectively delayed the project.

B.    At the beginning of the construction, A-MAC's excavation subcontractor, Ferguson, was improperly instructed by the Owner to remove the spoils from the site. However, this was not in A-MAC's or Ferguson's contract. As such, the Owner interfered with A-MAC's subcontractor and improperly increased the scope of work without a properly executed and negotiated change order.

C.    In an effort to make up for the time lost due to the late issuance of the Notice to Proceed and to meet the needs of the other contractors on site, the Program Manager decided to accelerate the installation of the foundations. The Program Manager directed A-MAC to use DeMaria Building Company and Filmore Construction as their subcontractors for the foundation work, thus eliminating A-MAC's ability to competitively bid the accelerated work. Additionally, the Program Manager decided that Filmore would use a prefabricated foundation wall system without the consent of the project architect and that could not be approved by the City of Detroit Building Department resulting in a constructive change to the contract. This interfering and disruptive action by the Program Manager further delayed the completion of the building foundations and impacted A-MAC's ability to manage costs by being burdened with unnecessary acceleration costs required to make up for time spent on the alternate foundation system.

D.    On July 20, 1998, Moody directed DeMaria, a subcontractor to A-MAC, to perform hauling work that A-MAC had another subcontractor scheduled to do. This action interfered with A-MAC's capacity to manage project costs by forcing A-MAC to pay the higher price that DeMaria charged rather than the amount previously agreed to with A-MAC's selected subcontractor. Because DeMaria was doing what the Program Manager desired rather than what A-MAC had planned, A-MAC's ability to manage the work had also been hindered.

E.  On or about November 10, 1998, Moody directed an A-MAC subcontractor, M&B Mechanical, Inc., to connect all water and sewer leads for all contracted buildings. This was not A-MAC's responsibility and not in A-MAC's scope of work, yet Moody, without consultation with A-MAC, directed that it be done. M&B Mechanical then sent a payment request to A-MAC for this extra work.

F.  During the latter part of December 1998, the Program Manager's on-site representative circulated a rumor to A-MAC's subcontractors that A-MAC had been paid amounts long past due from the Owner, when in fact it had not. Due to the rumor, many of A-MAC's subcontractors felt betrayed since they had agreed to work overtime and weekends with the understanding that payment of their invoices would be expedited. This is yet another example of how the Program Manager's action hindered and disrupted A-MAC's ability to execute the work.

G.  The Owner continually failed to provide materials and resources needed to complete the work. For example, A-MAC informed Nutt-Powell on October 16, 1998 that "[u]tility installation is critical. We need heat for the drywall finishing and painting. Please expedite the gas and electrical service as well as the water for Villages II & IV. As you know, the cool weather hinders the drywall finishings." Over a month later, with still no gas, A-MAC informed Nutt-Powell and Moody that there was a critical need for a "gas source for heat generation to accommodate the finish trade. It was promised for last Wednesday by Ken Moody. To date no gas. Temporary heat can only do so much."

H.  As part of the Contract, A-MAC had to use employees from Youthbuild. However, Youthbuild admits that it failed to provide sufficient workers and A-MAC was disputing its bill. Nonetheless, Nutt-Powell unilaterally paid the invoice and credited A-MAC's contract for such payment. Given the admitted failure of Youthbuild, this payment was improper and further evidences the Owner's interference and hindrance of A-MAC's efforts on the Project.

### The Owner Failed to Pay A-MAC and its Subcontractors as Required by the Contract

75.  The Owner continually refused to pay A-MAC for the work A-MAC and its subcontactors performed. Over the duration of the project, the Owner routinely held A-MAC's payment invoices in excess of the contractual period of thirty (30) days. The Owner's inability to pay in a timely fashion impacted A-MAC's ability to pay its subcontractors.

76.    The Owner understood the problems it was causing A-MAC by not paying timely. Indeed, on October 15, 1997, the Owner changed its internal procedures and informed A-MAC that the "above procedure will facilitate our payment system and help to ensure more timely payment of A-MAC's future invoices." This, however, did not help.

77.    After the Owner changed its procedures, A-MAC still had substantial problems receiving payment. Throughout the Project, A-MAC continually informed the Owner that the delay in payment was severely damaging A-MAC and its subcontractors. Indeed, many of A-MAC's subcontractors reduced their presence on the project because of the failure of the Owner to pay A-MAC. This effectively slowed down progress on the project.

78.    At the start of the construction in 1998, the Owner refused to pay A-MAC. Specifically, A-MAC submitted monthly invoices for construction activities. These were not paid. On July 15, 1998, Nutt-Powell informed A-MAC that, "[t]o clarify matters, all Invoices submitted to date by A-MAC but not acted upon need to be withdrawn." Indeed, A-MAC's May and June invoices for construction work were still unpaid as of September 15, 1998.

79.    On September 18, 1998, A-MAC informed Nutt-Powell and Moody that:

> Now is the time for management to push the proverbial "show me the money" button. The subcontractors doing the work will probably be pushing said button in about two or three weeks for the 8/4/98 billing submittal. We're in trouble if everything Ken Moody is telling me is true (for example, the Feds payment amounts to you per month will be something "less than" the total construction billing per month).

80.    A-MAC informed the Owner that its failure to pay A-MAC and its subcontractors was causing both a severe hardship to A-MAC and making it increasingly difficult to get subcontractors to work on the Project. Specifically, on September 22, 1998, A-MAC informed Nutt-Powell that:

> As you are aware, we have not been paid for any of our construction
> activities on the above mentioned project. The "word" around the City is
> that the Parkside project is not paying. This has created problems with us
> securing new subcontractors and convincing our current subcontractors to
> increase their manpower on the job.
>
> It is extremely important to us that some effort be made to pay our
> outstanding invoices as soon as possible. This is critical if we are to meet
> the scheduled completion date.

81.    Given the Owner's substantial problems with payment, the Owner agreed in late

1998 to pay A-MAC weekly. This promise, however, was never kept. For example, on

December 18, 1998, A-MAC informed Nutt-Powell that, "the subcontractors need to be paid. I

was told that the money is not available yet ... We were to be paid last Tues., 12/15/98. The new

date is Tues., 12/22/98. I thought subs would be paid once a week. We can't afford any more

slippage."

82.    By the end of December, 1998, these amounts were still not paid. A-MAC

informed Nutt-Powell and Moody on December 28, 1998 that, "..once again, no timely payments

as promised. We still have not been paid for work performed 60 to 80 days ago."

83.    These payment problems persisted. On March 24, 1999, A-MAC informed Nutt-

Powell that it had not been paid for November '98 through January 99 invoices. A-MAC asks,

"When are you going to pay my subcontractors. Please I need to know ASAP. They're telling

us they are going to walk off the job." Indeed, by that time, the following A-MAC subcontractors

had walked off the job for non-payment: M&B Mechanical, Hester Painting, Great Lakes

Roofing and Wayne/Oakland Development.

84.    On June 9, 1999, the problem still had not been corrected. A-MAC informed

Nelson that:

> This firm has suffered much harm under the subject contract either
> verbally or monetarily. We have been currently placed in a position where

22

it is extremely difficult to complete our contractual obligation without this long-overdue payment. We are owed over $1.3 million from November '98 to February '99 on Village IV. While a substantial portion is due subcontractors, the remaining portion is needed by us to pay other indebtedness.

We are told that this payment is held up by HUD due to the failure of the DHC to submit a proper report. I believe that other avenues should be used to satisfy our invoices and allow us to continue without interruption.

85.     The DHC has admitted both that it had these payment problems and that they caused A-MAC severe difficulty. Specifically, on June 21, 1999, Nelson, at that time the DHC's Executive Director, wrote A-MAC stating that, "We recognize that the non-payment of your invoices for work completed creates an untenable situation and we will correct the problem as soon as HUD releases the requested fund. Again, on behalf of the DHC, I offer you a sincere apology . . ."

86.     By June 25, 1999, A-MAC and its subcontractors were owed for the payment applications for the period from November 1988 to April 1999.

**A-MAC Has Been Severely Damaged By the Defendants' Actions**

87.     Throughout the Project, A-MAC was severely damaged by (i) the Owner's mismanagement of the Project; (ii) the Owner's interference with A-MAC and its subcontractors; (iii) the Owner's failure to make timely payments pursuant to the Contract; and (iv) the Defendants' concerted effort to put A-MAC out of business resulting in a decrease in A-MAC's bonding capacity.

88.     A-MAC is owed over one million dollars in retention money. In addition, A-MAC has requested an equitable adjustment of $2,905,604. Thus, A-MAC has already requested approximately four million dollars ($4,000,000) for project specific costs on the Project. These amounts do not include extended general conditions, home office overhead, lost business

23

opportunities or the fees and other costs relating to subcontractor lawsuits because the Owner has not paid the sums due to A-MAC. Indeed, recently the Owner sued A-MAC, although the Owner owes substantial sums to A-MAC. This also has increased A-MAC's costs in handling the matters arising out of the DHC Defendants' mismanagement and fraud on the Parkside project.

89.     Additionally, A-MAC's business has been harmed and its bonding capacity destroyed, resulting in A-MAC's inability to conduct business. Given the harm and utter destruction of A-MAC's business by the Defendants' concerted efforts, A-MAC is seeking additional damages for diminution in the value of its business. Such damages are in excess of ten-million dollars for loss of a thirty-year old Detroit business.

## COUNT I

**(Violation of Racketeer Influenced and Corrupt Organization Act ["RICO"]
18 U.S.C. §§1961 *et seq.* - Against Defendants Village of Parkside II, L.L.C., Village of
Parkside IV, L.L.C., DHC Parkside, Inc., the Detroit Housing Commission, Irene Hannah,
John Nelson, Capital Needs Unlimited, Inc., Ken Moody and DOES 1 - 20)**

90.     The allegations of paragraphs 1 through 89 above are fully incorporated herein by reference.

91.     This count arises under 18 U.S.C. §§1962 (c) and (d) of RICO.

92.     At all times material herein:

    a.     Defendant Village of Parkside II, L.L.C. ("Parkside II"), a Michigan limited liability corporation, was a person as defined by 18 U.S.C. §1961(3) engaged in or affecting interstate or foreign commerce;

    b.     Defendant Village of Parkside IV, L.L.C. ("Parkside IV"), a Michigan limited liability corporation, was a person as defined by 18 U.S.C. §1961(3) engaged in or affecting interstate or foreign commerce;

24

c.   Defendant DHC Parkside, Inc., a Michigan Corporation was a person as defined by 18 U.S.C. §1961(3) engaged in or affecting interstate or foreign commerce;

d.   Defendant the Detroit Housing Commission was a person as defined by 18 U.S.C. §1961(3) engaged in or affecting interstate or foreign commerce;

e.   Defendant Irene Hannah was a person as defined by 18 U.S.C. §1961(3) engaged in or affecting interstate or foreign commerce;

f.   Defendant John Nelson was a person as defined by 18 U.S.C. §1961(3) engaged in or affecting interstate or foreign commerce;

g.   On information and belief, Defendant Capital Needs Unlimited, Inc., a Massachusetts corporation, was a person as defined by 18 U.S.C. §1961(3) engaged in or affecting interstate or foreign commerce;

h.   Defendant Ken Moody was a person as defined by 18 U.S.C. §1961(3) engaged in or affecting interstate or foreign commerce; and

i.   Defendants DOES 1 – 20, on information and belief, are persons as defined by 18 U.S.C. §1961(3) engaged in or affecting interstate or foreign commerce.

93.   Parkside II, Parkside IV, DHC Parkside, Inc., the Detroit Housing Commission, Hannah, Nelson, Capital Needs Unlimited, Inc., Moody and DOES 1-20 (collectively "the RICO Defendants") operated as an association-in-fact, constituted an "enterprise," the activities of which affected interstate or foreign commerce, as the term "enterprise" is defined in 18 U.S.C. §1961(4) in that the enterprise was at all times an ongoing organization and the aforementioned parties were all functioning as a continuing unit.

94.   Beginning in or around November 1996, in Michigan and elsewhere, the RICO Defendants, being "persons" associated with the enterprise, did knowingly conspire and agree with each other and with others known and unknown to conduct and participate in the conduct of the affairs of the enterprise, directly and indirectly, through a pattern of racketeering activity, as

25

that term is defined in 18 U.S.C. §1961, which racketeering activity consisted of multiple acts of mail and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343 as alleged in paragraph 12 through paragraph 87 herein.

95.     It was a part of the conspiracy that the DHC authored the Solicitation and that Parkside II and Parkside IV would obtain the contracts with A-MAC through a series of misrepresentations and omissions.  The DHC set up Parkside II and Parkside IV in the hope of seeking state tax credits which the DHC could not obtain on its own.  At this time, DHC, DHC Parkside, Inc, Parkside II and Parkside IV (collectively the "DHC Defendants") knew that they did not have sufficient funds for the Project.  The DHC Defendants, however, misrepresented this fact to A-MAC and assured A-MAC that all payments would be made.

96.     Beginning on or before November 1996 and continuing throughout the Project, in numerous interstate wire communications and mailings, the RICO Defendants engaged in a scheme to defraud A-MAC, including activity (*e.g.*, misrepresenting the financial viability of the Project and the DHC's ability to pay A-MAC, the ability to meet site obligations prior to A-MAC's work, misrepresenting the scope and fundamental nature of A-MAC's work, misrepresenting that sufficient supervision would be provided by the Owner to insure a smooth Project) by which A-MAC was fraudulently induced to enter into the contracts on this Project. Specifically, in numerous interstate wire communications and mailings, the RICO Defendants engaged in a scheme to defraud A-MAC and others, including activity by which A-MAC was fraudulently induced to enter into its Contracts in reliance on false promises that (i) the Owner would make appropriate site preparations prior to A-MAC beginning construction and (ii) adequate supervision would be provided for the Project.

97.     The RICO Defendants also misrepresented that the roads, sewers and other site improvements would be made prior to construction.  Because there was insufficient funds to complete the Project, the RICO Defendants did not prepare the site as required.  These misrepresentations continued throughout 1997 as on several occasions the RICO Defendants represented to A-MAC that site work was to begin, when in fact no site work was planned and contracts had not even been signed with the contractors.

98.     Due to the continuing misrepresentations with respect to the lack of funds and the site improvements, the DHC intentionally failed to provide A-MAC with a Notice to Proceed with the construction. Although the Notice to Proceed was dated July 10, 1997, certain Defendants have admitted that A-MAC did not receive the Notice to Proceed until February 1998.  This was a part of the scheme.  Although A-MAC continually requested the Notice to Proceed, as is confirmed in meeting minutes in November 1997, it was not forthcoming.  This is because the RICO Defendants did not have the site prepared as required, and did not have sufficient funds to complete the project.  In order to keep A-MAC working on the design at that time, the DHC continued to misrepresent the financial viability of the project to A-MAC as well as continuing to misrepresent the progress of work at the site.

99.     While A-MAC was doing and having approved design work in the latter part of 1997, none of the RICO Defendants ever questioned why A-MAC was not on site.  Instead, they continued to represent that the roads and other site preparations would be done prior to A-MAC beginning construction.  However, the RICO Defendants had no intention of ever having the road work performed prior to A-MAC beginning construction because they did not have sufficient funds.  Indeed, in a meeting on October 21, 1997, Moody admitted that they were still

having problems with the roads and utility companies because "[d]elay in payments has held this up."

100.    The scheme continued into 1998, when on February 24, 1998, A-MAC received its Notice to Proceed with construction via facsimile. At this time, however, the weather conditions were atrocious, but more importantly the road and utility work was not completed, and indeed had not even started. The RICO Defendants, however, having misrepresented the status of site work and their intention to have the work completed, and feeling pressure from the federal office of the Department of Housing & Urban Development decided that it would blame A-MAC for all of the problems on the Parkside project. In this way, the RICO Defendants could both blame A-MAC for all of the delays on the Parkside project and begin taking work away from A-MAC and giving it to other contractors, while paying those other contractors more money.

101.    The RICO Defendants all cooperated and worked in concert with respect to the continuing scheme. The RICO Defendants blamed A-MAC for all of the problems on the Parkside project, including delaying the roads which were the DHC Defendants' responsibility. Then, A-MAC's contract was modified twice, each time work going to another contractor with the result that the contractor was paid more money. On information and belief, the RICO Defendants falsely explained their need for money to Federal HUD because of delays caused by A-MAC.

102.    The RICO Defendants actively attempted to conceal their fraudulent conduct from A-MAC. Therefore, the allegations contained herein are based on the best available information. As discovery continues the facts previously concealed should be discovered.

103.    In furtherance of the scheme, the RICO Defendants refused to pay A-MAC and its subcontractors for work performed. This conduct continued throughout the Project. As the RICO Defendants knew it would, this caused A-MAC and its subcontractors severe hardship and some of A-MAC's subcontractors walked off the job. This lack of payment and delay in payment was all designed to harm A-MAC and cause it efficiency problems, which would then be used as proof that is was A-MAC that caused the problems on the Parkside project.

104.    In furtherance of the scheme, even though it was untrue, the RICO Defendants started spreading "rumors" that A-MAC was paid, when in fact it had not been. These intentional acts by the RICO Defendants were designed to harm A-MAC's subcontractor relationships.

WHEREFORE, A-MAC requests that this Court enter a judgment against the RICO Defendants and in favor of A-MAC in an amount equal to three times the amount of actual and consequential damages incurred by A-MAC as a result of the racketeering conduct proved at trial and exemplary damages, together with costs, expenses, attorney fees and interest and such other and further relief as this Court deems appropriate.


## COUNT II

### (Sherman Antitrust Act Violation – Against Defendants Village of Parkside II, L.L.C., Village of Parkside IV, L.L.C., the DHC Parkside, Inc. and the Detroit Housing Commission)

105.    The allegations contained in paragraphs 1 through 104 are fully incorporated herein by reference.

106.    The claims in this count are commenced pursuant to 15 U.S.C. §15, commonly known as Section 4 of the Clayton Act. The purpose of these claims is to recover damages

against the DHC Defendants for injuring A-MAC in its business of construction contracting in Detroit, which injury proximately resulted from the DHC Defendants' violations of the antitrust laws of the United States, as more specifically set forth below.

107.    A-MAC's business and business activities are within, and directly affect, trade and commerce among the several states. In the course of such business, there is a constant and continuous stream of trade and commerce between the several states and territories of the United States, consisting of the purchase of materials, supplies and subcontracting services, the payment of invoices and the receipt of funds.

108.    The DHC Defendants restrained trade by illegally tying the continuation of A-MAC's contract with entering into a subcontract with DeMaria. The DHC Defendants further restrained trade by not allowing the subcontract to be competitively bid, but instead, required that DeMaria be the only subcontractor considered.

109.    The DHC Defendants contracted, combined and conspired to restrain trade in the construction contracting market in Detroit. The intent, object or purpose of the said contract, combination and conspiracy was to restrain competition for contracting services by circumventing the bidding processes.

110.    The DHC Defendants' efforts to force the inclusion of DeMaria in the Parkside project constitute an unreasonable restraint of trade akin to reciprocal dealing or tying arrangements which are *per se* violations of 15 USC §1, commonly referred to as Section 1 of the Sherman Act.

111.    The DHC Defendants' actions further tend to prejudice the public interest through the lessening of competition for construction contracting services in connection with the Parkside project and higher prices paid by public funds for such services.

30

112.    The DHC Defendants' actions further directly and intentionally caused A-MAC to suffer exactly the sort of injuries the antitrust laws were intended to redress, including but not limited to lost profits on the Parkside project.

WHEREFORE A-MAC demands judgment against the DHC Defendants jointly and severally for the damages it proves at trial, said sum to be trebled in accordance with Section 4 of the Clayton Act, for its costs incurred in bringing this action, including its attorneys fees in accordance with Section 4 of the Clayton Act and such other and further relief as this Court deems just and equitable.

## COUNT III

**(Breach of Contract – Against Defendants Village of Parkside II, L.L.C.,
and the Village of Parkside IV, L.L.C)**

113.    The allegations of paragraphs 1 through 112 above are fully incorporated here by reference.

114.    A-MAC and the Owner entered into the Contract based on the written and oral representations of the Owner and the Contract Documents which included certain drawings, specifications and related documents. Those documents provided, inter alia, that the Owner would timely and properly make the site available to A-MAC, that A-MAC would be allowed sufficient time and access to the work in order to complete the work in accordance with the schedule representations of the Owner, that A-MAC's work would not be interfered with or disrupted by the Owner or the Owner's contractors and that the Owner would timely perform its obligations and make payments to A-MAC so as not to interfere with the orderly and efficient progress of A-MAC's work.

31

115.   The Owner repeatedly and materially breached the Contract.  Its breaches include, but are not limited to:

      a.    Delaying the Notice to Proceed;

      b.    Delaying access to the site;

      c.    Failure to provide the site in the condition agreed upon and with the appropriate layouts of buildings;

      d.    Interfering, disturbing and hindering the installation of A-MAC's work;

      e.    Interfering with and directing the work of A-MAC's subcontractors and approving additional work for those subcontractors without compensating A-MAC;

      f.    Failing to provide timely and accurate information when requested by A-MAC;

      g.    Failing to process and agree to change order requests and to otherwise bargain in good faith;

      h.    Significantly changing the scope and nature of the project through repeated unilateral changes, changes in the conditions of the work and site, changes in the schedule and through accelerations and compressions in the schedule for the work, all amounting to a cardinal change of the contract;

      i.    Failing to make timely payments as required by the contract; and

      j.    Refusal to deal with A-MAC fairly and in good faith.

116.   As a direct and foreseeable result of the foregoing breaches by Owner, A-MAC has been damaged, including, but not limited to, the following:

      a.    Increased labor, material and subcontractor costs due to delayed extra work;

      b.    Loss of expected labor productivity due to disruptions, schedule compression and accelerations;

      c.    Lost profits and business opportunities;

      d.    Injury to A-MAC's business reputation;

e.     Denied access to working capital;

f.     Loss of the use of the moneys owing but not paid; and

g.     Extended home office and site costs and overhead.

117.    Despite repeated demands, the Owner has refused and failed to pay A-MAC the amounts owing to A-MAC as the result of the foregoing breaches.

WHEREFORE, A-MAC requests that this Court enter a judgment in its favor and against the Owner in whatever amount is found to be owing to A-MAC, together with costs, attorney fees and interest.

## COUNT IV

**(Lien Foreclosure – Against Defendants Village of Parkside II, L.L.C., Village of Parkside IV, L.L.C., the DHC Parkside, Inc. and the Detroit Housing Commission)**

118.    The allegations of paragraphs 1 through 117 above are fully incorporated herein by reference.

119.    A-MAC provided an improvement to the Property (described in Exhibit A attached hereto) pursuant to the Contract.

120.    A-MAC first provided labor and material for the foregoing improvement on July 10, 1997 and last provided such labor and material on March 2, 2000.

121.    The Owner had actual notice of the labor and materials being provided by A-MAC for the improvement the Property contemporaneously with the providing of such labor and materials.

122.    A-MAC has provided all required sworn statements and partial waivers and has otherwise satisfied all of the requirements of the Act for a valid lien.

33

123.    On May 26, 2000, A-MAC timely filed its Claims of Lien for Village II and Village IV against the Property (Exhibit A).

124.    A-MAC has a valid lien against the Property.

WHEREFORE, A-MAC requests that this Court:

A.    Enter an order declaring that A-MAC has two valid liens on the Property in the amount of $4,421,693.87, with time-price differential, attorney fees, costs and interest accruing until the balance is paid.

B.    In default of payment thereof, order a sale of the Property and from the proceeds of such sale, order payment to A-MAC, the sum found to be due it together with interest, costs and attorneys fees.

## COUNT V

**(Unjust Enrichment – Against Defendants Village of Parkside II, L.L.C., Village of Parkside IV, L.L.C., DHC Parkside, Inc., the Detroit Housing Commission)**

125.    The allegations of paragraphs 1 through 124 above are fully incorporated herein by reference.

126.    Defendants Village of Parkside II, L.L.C., Village of Parkside IV, L.L.C., DHC Parkside, Inc. and the Detroit Housing Commission, knowingly accepted the benefits provided by the labor and materials provided by A-MAC and its subcontractors knowing that A-MAC intended to be paid for providing these benefits.

127.    Despite repeated demands by A-MAC, the Defendants have refused to pay the total value of the services furnished by A-MAC and the Defendants have been unjustly enriched.

WHEREFORE, A-MAC requests that this Court enter a judgment in its favor and against the DHC Defendants in whatever amount is found to be owing to A-MAC, together with costs, attorney fees and interest.

## COUNT VI

**(Fraud – Against Defendants Village of Parkside II, L.L.C., Village of Parkside IV, L.L.C., DHC Parkside, Inc., the Detroit Housing Commission, Irene Hannah, John Nelson, Capital Needs Unlimited, Inc. , Ken Moody and DOES 1-20)**

128.    The allegations of paragraphs 1 through 127 above are fully incorporated herein by reference.

129.    In connection with the negotiations of the agreement between the Ownership entities and A-MAC which led to the execution of the contracts, and with the knowledge, consent and tacit approval of the DHC and DHC Parkside, Inc., and in addition to the allegations stated in the preceding paragraphs, the Village of Parkside II and the Village of Parkside IV did not disclose that they and the DHC did not have sufficient funds to initially start the project, nor did they disclose that they did not have sufficient funds to prepare the site as they were obligated to do under the Contract.

130.    A-MAC entered into its contracts based solely on the representations, both implicit and explicit, that (i) the Ownership entities had sufficient funding to start the Parkside project, (ii) that the Notice to Proceed would be issued in a timely fashion and that (iii) A-MAC would be paid timely for its work.  A-MAC would not have entered into the contracts had the Ownership entities or DHC disclosed these facts.  Instead, A-MAC would have entered into other contracts, which it was precluded from doing once it entered into the contracts with the Ownership entities because of the seven million dollar bond required on the Parkside project.

131.    The DHC Defendants knew or should have known that A-MAC would rely on their representations in entering into the contracts.  Thus, in making the foregoing representations and in failing to disclose the foregoing material facts, the DHC Defendants, Hannah, Nelson, CNU, Moody and DOES 1-20 (collectively the "Fraud Defendants")

35

fraudulently intended to induce A-MAC into entering into the contracts and to rely detrimentally on the misrepresentations and omissions of the DHC Defendants.

132.    A-MAC justifiably relied upon the material misrepresentations and omissions of the DHC Defendants in entering into the contracts.

133.    As a direct and foreseeable result of the foregoing actions by the Fraud Defendants, A-MAC has been damaged, including, but not limited to, the following:

    a.    Increased labor, material and subcontractor costs due to delayed extra work;

    b.    Loss of expected labor productivity due to disruptions, schedule compression and accelerations;

    c.    Lost profits and business opportunities;

    d.    Injury to A-MAC's business reputation;

    e.    Denied access to working capital;

    f.    Loss of the use of the moneys owing but not paid; and

    g.    Extended home office and site costs and overhead.

134.    Given the improper use of public funds and the misrepresentations and omissions of the Fraud Defendants to A-MAC, the fraud constitutes outrageous, immoral, and unconscionable acts which justify the imposition of exemplary damages.

WHEREFORE, A-MAC requests that this Court enter a judgment in its favor and against the Defendants in whatever amount is found to be owing to A-MAC, together with costs, attorney fees, interest and exemplary damages.

## COUNT VII

**(Fraud Based on Bad Faith Promise – Against Defendants Village of Parkside II, L.L.C., Village of Parkside IV, L.L.C., DHC Parkside, Inc., and the Detroit Housing Commission)**

135. The allegations of paragraphs 1 through 133 above are fully incorporated herein by reference.

136. The DHC Defendants promised that they would timely pay A-MAC for the work performed and promised to have the site prepared prior to A-MAC commencing construction.

137. At the time the DHC Defendants made the promise, they did not intend to keep it.

138. The DHC Defendants made the promise with the intent that A-MAC would rely on it.

139. A-MAC relied on the DHC Defendants' promises.

140. A-MAC was damaged as a result of its reliance on the DHC Defendants' promises.

WHEREFORE, A-MAC requests that this Court enter a judgment in its favor and against the Defendants in whatever amount is found to be owing to A-MAC, together with costs, attorney fees, interest and exemplary damages.

## COUNT VIII

**(Innocent Misrepresentation – Against Defendants Village of Parkside II, L.L.C., Village of Parkside IV, L.L.C., DHC Parkside, Inc., the Detroit Housing Commission)**

141. The allegations of paragraphs 1 through 140 above are fully incorporated herein by reference.

142.    The DHC Defendants represented that they would timely pay A-MAC for the work performed and they promised to have the site prepared prior to A-MAC commencing construction.

143.    These representations were made in connection with the execution of the contracts between the Ownership entities and A-MAC.

144.    The representations were false when made.

145.    A-MAC would not have entered into the contracts if the DHC Defendants had not made the representations.

146.    A-MAC had a loss as a result of entering into the contracts.

147.    A-MAC's loss benefited the DHC Defendants.

WHEREFORE, A-MAC requests that this Court enter a judgment in its favor and against the Defendants in whatever amount is found to be owing to A-MAC, together with costs, attorney fees, interest and exemplary damages.

### COUNT IX

**(Conspiracy – Against Defendants Village of Parkside II, L.L.C., Village of Parkside IV, L.L.C., DHC Parkside, Inc., the Detroit Housing Commission, Irene Hannah, John Nelson and DOES 1-20)**

148.    The allegations of paragraphs 1 through 147 above are fully incorporated herein by reference.

149.    The DHC Defendants, Hannah, Nelson and DOES 1-20 (the "Conspiracy Defendants") acted in concert and conspired to commit fraud as alleged in Counts VI and VII.

150.    As a direct and foreseeable result of the foregoing actions by the Conspiracy Defendants, A-MAC has been damaged, including, but not limited to, the following:

       a.    Increased labor, material and subcontractor costs due to delayed extra work;

    b.    Loss of expected labor productivity due to disruptions, schedule compression and accelerations;

    c.    Lost profits and business opportunities;

    d.    Injury to A-MAC's business reputation;

    e.    Denied access to working capital;

    f.    Loss of the use of the moneys owing but not paid; and

    g.    Extended home office and site costs and overhead.

151.    Given the improper use of public funds, and the misrepresentations and omissions of the Conspiracy Defendants to A-MAC, the fraud constitutes outrageous, immoral, and unconscionable acts which justify the imposition of exemplary damages.

WHEREFORE, A-MAC requests that this Court enter a judgment in its favor and against the Defendants in whatever amount is found to be owing to A-MAC, together with costs, attorney fees, interest and exemplary damages..

## COUNT X

### (Third Party Beneficiary Breach of Contract – Against Defendant Capital Needs Unlimited, Inc.)

152.    The allegations of paragraphs 1 through 151 above are fully incorporated herein by reference.

153.    Defendant Capital Needs Unlimited, Inc. ("CNU") entered into a contract with, on information and belief, Defendant DHC whereby CNU undertook to perform Project Manager services on the Parkside project. According to the contract, on information and belief, CNU agreed to provide project management services, including but not limited to preparing the site for

construction, coordinating construction among the contractors, insuring that there were no Owner-caused interferences with construction and insuring prompt payment of invoices.

154.   Both Defendant DHC and CNU intended their contract directly to benefit A-MAC, in that CNU would coordinate construction among the contractors and otherwise supervise and coordinate all contractors working on the Parkside project.

155.   CNU, however, failed to prepare necessary master schedules, failed to update schedules, failed to coordinate contractor activities, failed to have continuous supervision on the site. Instead, CNU assigned Nutt-Powell to the project, who only spent one or two days a week on the project. Consequently, CNU breached its contract with the DHC.

156.   CNU owed a duty to A-MAC, as a party directly intended to benefit from the contract between CNU and the DHC, to undertake and perform its work so as not to damage A-MAC.

157.   CNU breached its duty to A-MAC by failing to prepare necessary master schedules, failing to update schedules, failing to coordinate contractor activities and failing to have continuous supervision on site by assigning Nutt-Powell to the project.

158.   As a direct and foreseeable result of CNU's breach of contract, A-MAC has been damaged, including, but not limited to, the following:

  a. Increased labor, material and subcontractor costs due to delayed extra work;

  b. Loss of expected labor productivity due to disruptions, schedule compression and accelerations;

  c. Lost profits and business opportunities;

  d. Injury to A-MAC's business reputation;

  e. Denied access to working capital;

    f.      Loss of the use of the moneys owing but not paid; and

    g.      Extended home office and site costs and overhead.

WHEREFORE, A-MAC requests that this Court enter a judgment in its favor and against the Defendants in whatever amount is found to be owing to A-MAC, together with costs, attorney fees and interest.

## COUNT XI

### (Professional Negligence – Against Defendant Capital Needs Unlimited, Inc.)

159.    The allegations of paragraphs 1 through 158 above are fully incorporated herein by reference.

160.    Defendant Capital Needs Unlimited, Inc. ("CNU") entered into a contract with, on information and belief, Defendant DHC whereby CNU undertook to perform Project Manager services on the Parkside project.  CNU owed a duty to A-MAC as a party foreseeably injured by any negligence of CNU in undertaking its work on the Parkside project.

161.    CNU breached its duty to A-MAC and the applicable standard of care by failing to prepare necessary master schedules, failing to update schedules, failing to coordinate contractor activities and failing to have continuous supervision on site by assigning Nutt-Powell to the project.

162.    As a direct and foreseeable result of CNU's professional negligence, A-MAC has been damaged, including, but not limited to, the following:

    a.      Increased labor, material and subcontractor costs due to delayed extra work;

    b.      Loss of expected labor productivity due to disruptions, schedule compression and accelerations;

    c.      Lost profits and business opportunities;

d.  Injury to A-MAC's business reputation;

e.  Denied access to working capital;

f.  Loss of the use of the moneys owing but not paid; and

g.  Extended home office and site costs and overhead.

WHEREFORE, A-MAC requests that this Court enter a judgment in its favor and against CNU in whatever amount is found to be owing to A-MAC, together with costs, attorney fees and interest.

## COUNT XII

### (Third Party Beneficiary Breach of Contract – Against Defendant Ken Moody

163.    The allegations of paragraphs 1 through 162 above are fully incorporated herein by reference.

164.    Defendant Ken Moody ("Moody"), on information and belief entered into a contract with, on information and belief, Defendant DHC whereby Moody undertook to perform project architectural services as the Owner's representative on the Parkside project. According to the contract, on information and belief, Moody agreed to promptly review and approve drawings, inspect and approve work and promptly respond to change requests.

165.    Both Moody and the DHC intended their contract directly to benefit A-MAC, in that Moody would promptly review and approve drawings, inspect and approve work and promptly respond to change requests.

166.    Moody, however, failed to promptly review and approve drawings, failed to inspect and approve work and failed to promptly respond to change requests. Consequently, Moody breached its contract with the DHC.

167.    Moody owed a duty to A-MAC, as a party directly intended to benefit from the contract between CNU and the DHC, to undertake and perform its work so as not to damage A-MAC.

168.    Moody breached its duty to A-MAC by failing to promptly review and approve drawings, failing to inspect and approve work and failing to respond promptly to change requests.

169.    As a direct and foreseeable result of Moody's breach of contract, A-MAC has been damaged, including, but not limited to, the following:

        a.    Increased labor, material and subcontractor costs due to delayed extra work;

        b.    Loss of expected labor productivity due to disruptions, schedule compression and accelerations;

        c.    Lost profits and business opportunities;

        d.    Injury to A-MAC's business reputation;

        e.    Denied access to working capital;

        f.    Loss of the use of the moneys owing but not paid; and

        g.    Extended home office and site costs and overhead.

WHEREFORE, A-MAC requests that this Court enter a judgment in its favor and against the Defendants in whatever amount is found to be owing to A-MAC, together with costs, attorney fees and interest.

## COUNT XIII

### (Professional Negligence – Against Defendant Ken Moody

170.    The allegations of paragraphs 1 through 169 above are fully incorporated herein by reference.

43

171.    Defendant Ken Moody ("Moody"), on information and belief, entered into a contract with Defendant DHC whereby Moody undertook to perform project architectural services as the Owner's representative on the Parkside project.  Moody owed a duty to A-MAC, as a party foreseeably injured by any negligence of Moody in undertaking its work on the Parkside project.

172.    Moody breached its duty to A-MAC and the applicable professional standard of care by failing to promptly review and approve drawings, failing to inspect and approve work and failing to respond promptly to change requests.

173.    As a direct and foreseeable result of Moody's professional negligence, A-MAC has been damaged, including, but not limited to, the following:

    a.    Increased labor, material and subcontractor costs due to delayed extra work;

    b.    Loss of expected labor productivity due to disruptions, schedule compression and accelerations;

    c.    Lost profits and business opportunities;

    d.    Injury to A-MAC's business reputation;

    e.    Denied access to working capital;

    f.    Loss of the use of the moneys owing but not paid; and

    g.    Extended home office and site costs and overhead.

WHEREFORE, A-MAC requests that this Court enter a judgment in its favor and against Moody in whatever amount is found to be owing to A-MAC, together with costs, attorney fees and interest.

44

## COUNT XIV

**(Business Defamation – Against Defendants Village of Parkside II, L.L.C., Village of Parkside IV, L.L.C., DHC Parkside, Inc., the City of Detroit, the Detroit Housing Commission, Irene Hannah, John Nelson, Capital Needs Unlimited, Inc. and Ken Moody)**

174. The allegations of paragraphs 1 through 173 above are fully incorporated herein by reference.

175. Defendants have told A-MAC subcontractors, suppliers and others in the Detroit metropolitan construction area that A-MAC is an unqualified contractor and that A-MAC does not properly pay its subcontractors and that A-MAC failed to pay subcontractors even when it was paid.

176. These communications regarding A-MAC's business practices were false and defamatory.

177. Defendants have made the communications negligently and/or maliciously.

178. The statements made were not privileged.

179. A-MAC has been damaged by Defendants' malicious and/or negligent untrue statements.

WHEREFORE, A-MAC requests that this Court enter a judgment in its favor and against the Defendants in whatever amount is found to be owing to A-MAC, together with costs, attorney fees and interest.

45

## JURY DEMAND

A-MAC demands a trial by jury of all matters at issue in this litigation which can be properly tried to a jury.

Respectfully submitted,

McALPINE & McALPINE, P.C.

Mark L. McAlpine (P35583)
Steven A. Wright (P56970)
200 East Long Lake Road
Suite 160
Bloomfield Hills, Michigan 48304
(248) 723-5100

Dated: November 7, 2000

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

# SEE CASE FILE FOR ADDITIONAL DOCUMENTS OR PAGES THAT WERE NOT SCANNED